**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

DONNA WILLS,

                Plaintiff,

v.                                    Case No. 3:12-cv-870-J-34JRK

UNITED STATES OF AMERICA,

                Defendant.

_____/

**O R D E R**

**THIS CAUSE** is before the Court on Defendant's Dispositive Motion to Dismiss and

Motion for Summary Judgment (Doc. 32; Motion), filed by the Defendant United States of

America on November 4, 2014. Plaintiff Donna Wills filed Plaintiffs' [sic] Amended Response

to Defendant's Motion to Dismiss and Memorandum in Support Thereof (Amended as to

Paragraph Numbers Only) (Doc. 36; Amended Response) on November 19, 2014. The

United States filed Defendant's Reply Brief (Doc. 42; Reply) on January 12, 2015.

Accordingly, the matter is ripe for review.

**I.**      **Factual and Procedural History**

      **A.**      **The Castillo de San Marcos National Monument**

      This case is brought pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b)

(FTCA), for personal injuries sustained by Wills as a result of a fall at the Castillo de San

Marcos National Monument ("the Castillo" or "the Monument") in St. Augustine, Florida. The

Castillo is a unit of the national park system administered by the National Park Service (Park Service), which is a bureau of the United States Department of Interior. <u>See</u> Declaration of Gordon Wilson ¶¶ 1-2 (Doc. 32-2, Exhibit A; Wilson Decl.). The Spanish founded St. Augustine in 1565 and began construction on the Castillo in 1672. <u>See</u> Defendant's Exhibit A-3 at 3 (Doc. 32-2 at 13-66; Def.'s Exhibit A-3). In 1821, Spain signed a treaty which transferred ownership of Florida to the United States, and the United States War Department administered the Castillo, renamed Fort Marion, for more than a century. <u>Id.</u> The Castillo was declared a national monument in 1924, and in 1933, its administration passed from the War Department to the Park Service. <u>Id.</u> The Castillo comprises over twenty acres of land and contains the oldest remaining European fortification in the United States. <u>See id.</u> at 1.

The Castillo itself is a "bastioned masonry fortification" built around a square plaza with diamond-shaped bastions projecting outward at each corner. <u>Id.</u> at 18. Its coquina walls are 30 feet high, 10 to 14 feet thick at the base, and five feet thick at the top. <u>Id.</u> at 18-19. The Castillo contains several historic structures which date from different periods of historical significance. <u>See id.</u> at 3. These historic features include the Castillo, moat, covered way, glacis, ravelin, City Gate, reconstructed Cubo Line, water battery, seawall, and hot shot furnace. <u>Id.</u> The moat, covered way, and glacis surround the Castillo on the north, west, and south sides. <u>Id.</u> at 19. The moat originally encircled the fort on all four sides, but the east side was filled with earth in 1842 to create a water battery. <u>Id.</u>

In a Declaration submitted in support of the Motion, Gordon Wilson, Park Service employee and Superintendent at the Castillo since 1992, testifies that his understanding of Wills's allegations is that "she was walking on the historic seawall, walked off the edge, and

fell onto the ground below." See Wilson Decl. ¶ 4.  According to Wilson, "[t]he ground on which [Wills] fell is part of the water battery." Id.  The seawall and water battery are historic features of the Castillo which date from the War Department era and which are now preserved and protected by the Park Service.  Id. ¶ 5; Def.'s Exhibit A-3 at 19.  Both structures are included on the Castillo's List of Classified Structures, which designates the seawall and water battery as part of the coastal defense system undertaken in the nineteenth century. See Defendant's Exhibit A-1 (Doc. 32-2 at 7-9; Def.'s Exhibit A-1); Defendant's Exhibit A-2 (Doc. 32-2 at 10-12; Def.'s Exhibit A-2).  The seawall, which was originally built by the Spanish in the late seventeenth century and was substantially reconstructed by the United States Army Corp of Engineers between 1833 and 1844, separates the water battery from the Matanzas Bay.  Def.'s Exhibit A-3 at 33; Def.'s Exhibit A-1 at 1.  The water battery is built on the filled-in eastern portion of the Castillo's moat, facing the Mantanzas River.  Def.'s Exhibit A-2 at 1.  The Army Corp of Engineers filled in the water battery area between 1842 and 1844.  Def.'s Exhibit A-3 at 33.  The seawall is a coquina structure faced with granite to the high water mark, and the water battery is constructed of earth and coquina stone.  Def.'s Exhibit A-3 at DOI_0808.  The Castillo contains numerous elevation changes, with rolling, grassy areas and many walls of varying heights. See Defendant's Exhibit A-6 at DOI_0193 (Doc. 32-3 at 7-9, Def.'s Exhibit A-6).

## B.    Wills's Injury and Lawsuit

Wills visited the Castillo grounds on September 11, 2010, with some of her family.  Deposition of Donna R. Wills at 44-53 (Doc. 32-4; Wills Dep.).  Wills, her son, daughter, son-in-law, and grandchildren entered the Castillo grounds together but eventually split up into

three groups with her son and son-in-law walking ahead, Wills walking alone in the middle, and her daughter and grandchildren walking behind, with "quite a distance" between the three groups. Id. at 52, 56-57.  Wills recalled seeing a man on the Castillo grounds dressed like a pirate, with a lantern, who appeared to be giving a guided tour, but testified that he was "in the distance with a bunch of other people." Id. at 55.  Wills also remembered walking on grass and going up a hill. Id. at 54-55.  She was determined to catch up with her son, who had come into town for a surprise visit, and followed her son's general direction after seeing him go up some steps. Id. at 45, 55, 57-58.

At some point, Wills lost sight of her son but kept heading in the same direction. Id. at 58.  She ascended the wooden stairs that her son had taken and walked out onto the seawall. Id. at 59-62.  When she did this, Wills was still looking for and trying to catch up with her son. Id. at 61.  As Wills started to walk out onto the seawall, she noticed that the top of the wall was not level and realized that she "shouldn't have been out there." Id. at 62. She then stepped off the side of the seawall, mistakenly believing that the ground was level with it. Id. at 62-64.  Wills fell and was injured. Id. at 63.

On December 15, 2011, Wills submitted an administrative claim to the United States Department of the Interior using a Standard Form 95 (SF 95). See Defendant's Exhibit C-1 (Doc. 32-5 at 4-7; Def.'s Exhibit C-1).  On March 20, 2012, the Department of the Interior denied Wills's administrative claim on the basis of the discretionary function exception. See Defendant's Exhibit C-2 at 1-2 (Doc. 32-5 at 8-11; Def.'s Exhibit C-2).[1]

---

[1] The Department of the Interior denied Wills's claim on the alternative basis that Florida's recreational use statute, FLA. STAT. § 375.251, applies and shields the United States from liability. See Def.'s Exhibit C-2 at 2-3.

Wills filed her Complaint (Doc. 1; Complaint) on August 1, 2012. See Complaint. On December 18, 2012, the Court issued an Order to Show Cause why the Complaint should not be dismissed for failure to prosecute due to Wills's failure to serve the United States with the summons and Complaint. See Order (Doc. 4). The Court dismissed the action without prejudice on January 8, 2013, due to Wills's failure to effect service of process on the United States. See Order (Doc. 5). On March 6, 2013, Wills filed Plaintiff's Motion for Reconsideration on Court's Order to Show Cause and for Extension to Serve Defendant and Incorporated Memorandum of Law (Doc. 7; Motion for Reconsideration) seeking leave of Court for an opportunity to serve the United States. The Court granted the Motion for Reconsideration, directed the Clerk of Court to reopen the case, and gave Wills an opportunity to effect proper service on the United States. See Order (Doc. 10).

In the Complaint, Wills alleges that the United States breached its duty to her by negligently: 1) "allowing a dangerous foot drop off to exist in the area where invitees, including Plaintiff[,] were expected to walk"; 2) "failing to warn Plaintiff of the existence of the" drop off; 3) "failing to provide adequate lighting"; 4) "failing to erect a guard rail or other barrier"; and 5) "failing to supervise the activities of private companies operating on its premises under Commercial Use Authorizations." Complaint ¶ 8. With respect to Wills's claim concerning the Park Service's negligence in allowing and failing to warn of the drop off, failing to provide lighting, and failing to provide railings, the United States seeks dismissal pursuant to Federal Rule of Civil Procedure (Rule(s)) 12(b)(1) for lack of subject matter jurisdiction based on the discretionary function exception to the FTCA. Motion at 1, 8-21. To the extent that Wills claims that the Park Service was negligent in failing to supervise the

activities of private companies operating under a Commercial Use Authorization ("CUA") (hereinafter, Wills's "negligent supervision claim"), the United States seeks dismissal on the grounds that the Court lacks subject matter jurisdiction due to Wills's failure to exhaust her administrative remedies under the FTCA. Id. at 21-22.  Additionally, as to this claim, the United States moves in the alternative for summary judgment under Rule 56, and argues that to the extent Wills can establish the elements of a negligent supervision claim, the United States is entitled to dismissal of the claim based on the discretionary function exception. Id. at 23-25.

## II.    Standard of Review

In any case, "a court must first determine whether it has proper subject matter jurisdiction before addressing the substantive issues." Taylor v. Appleton, 30 F.3d 1365, 1366 (11th Cir. 1994).  If jurisdiction is found to be lacking, the Court cannot proceed at all; its sole remaining duty is to state that it lacks jurisdiction and dismiss the case. See Steel Co. v. Citizens for a Better Env't., 523 U.S. 83, 94 (1998); see also Univ. of S. Ala. v. Am. Tobacco Co., 168 F.3d 405, 410 (11th Cir. 1999) ("[O]nce a federal court determines that it is without subject matter jurisdiction, the court is powerless to continue."). Courts "'have an independent obligation to determine whether subject-matter jurisdiction exists,' even if no party raises the issue, and if the court determines that subject matter jurisdiction is lacking, it must dismiss the entire case." Trusted Net Media Holdings, LLC v. Morrison Agency, Inc., 550 F.3d 1035, 1042 (11th Cir. 2008) (quoting Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006)).  Thus, before proceeding further, the Court must consider the threshold question

of whether it possesses subject matter jurisdiction over Wills's claim.[2]

It is well established that the United States is immune from suit unless it has consented to be sued, and its consent to be sued defines the terms and conditions upon which it may be sued.  United States v. Mitchell, 445 U.S. 535, 538 (1980).  The FTCA provides that the United States may be held liable for money damages for "injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment" in the same manner and to the same extent as a private person under like circumstances. 28 U.S.C. § 1346(b)(1); Turner ex rel. Turner v. United States, 514 F.3d 1194, 1203 (11th Cir. 2008).  Thus, the "FTCA is a specific, congressional exception" to the United States' sovereign immunity.  Suarez v. United States, 22 F.3d 1064, 1065 (11th Cir. 1994).  As such, the waiver of sovereign immunity permitted under the FTCA "must be scrupulously observed, and not expanded, by the courts."  Id.

While the FTCA waives the United States' sovereign immunity from suit in federal courts for the negligent actions of its employees, this waiver of sovereign immunity is subject

---

[2] The determination of whether the Court has subject matter jurisdiction is made pursuant to the requirements of Rule 12(b)(1), Federal Rules of Civil Procedure (Rule(s)).  See Macia v. U.S. Marshals Serv., 277 F. App'x 914, 914 n.1 (11th Cir. 2008) (dismissal of FTCA action under exception to the FTCA treated as if district court were ruling on a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1)); Gabriel v. United States, No. 3:06-cv-917-J-32HTS, 2009 WL 22289, at *2 (M.D. Fla. Jan. 2, 2009); see also Sheely v. MRI Radiology Network, P.A., 505 F.3d 1173, 1182 (11th Cir. 2007).  Attacks on subject matter jurisdiction based on Rule 12(b)(1) come in two forms– facial attacks and factual attacks.  Morrison v. Amway Corp., 323 F.3d 920, 924 n.5 (11th Cir. 2003) (citing Lawrence v. Dunbar, 919 F.2d 1525, 1528-29 (11th Cir. 1990)).  Facial attacks challenge subject matter jurisdiction based on the allegations in a complaint, and the Court takes those allegations as true in reviewing the motion to dismiss.  Id.  Factual attacks challenge subject matter jurisdiction based on subject matter jurisdiction in fact, and the Court may consider extrinsic evidence, such as testimony and affidavits.  Id.  Because the parties have submitted extrinsic evidence on the question of the existence of subject matter jurisdiction, this is a factual evaluation of the Court's subject matter jurisdiction.  Thus, the Court may consider matters outside of the pleadings and is free to weigh the evidence concerning jurisdiction as long as the issues do not implicate the merits of plaintiff's action.  See Morrison, 323 F.3d at 924-25.

to several exceptions. Cohen v. United States, 151 F.3d 1338, 1340 (11th Cir. 1998). "The discretionary function exception . . . precludes government liability for '[a]ny claim based upon . . . the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.'" Id. (quoting 28 U.S.C. § 2680(a)). "If the discretionary function exception applies, the FTCA claim must be dismissed for lack of subject matter jurisdiction." Id.; see also U.S. Aviation Underwriters, Inc. v. United States, 562 F.3d 1297, 1299 (11th Cir. 2009) (stating that "[w]hen the discretionary function exception applies, no federal subject matter jurisdiction exists").

"The discretionary function exception 'marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals.'" Cohen, 151 F.3d at 1340 (quoting United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 808 (1984)). This is so because to impose "liability on the government for its employees' discretionary acts 'would seriously handicap efficient governmental operations.'" Id. at 1340-41 (quoting Varig Airlines, 467 U.S. at 814). Thus, "even negligent performance of a discretionary function does not subject the government to liability under the Federal Tort Claims Act." Red Lake Band of Chippewa Indians v. United States, 800 F.2d 1187, 1194 (D.C. Cir. 1986).

The Supreme Court has enunciated a two-part test for determining whether the discretionary function exception bars suit against the United States. United States v. Gaubert, 499 U.S. 315, 322-23 (1991) (citing Berkovitz v. United States, 486 U.S. 531, 536-

37 (1988)); see also Ochran v. United States, 117 F.3d 495, 499 (11th Cir. 1997).  "First, the court must examine whether the challenged conduct is 'discretionary in nature' or whether the conduct 'involve[s] an element of judgment or choice.'" U.S. Aviation Underwriters, Inc., 562 F.3d at 1299 (quoting Gaubert, 499 U.S. at 322) (internal quotation omitted).  "Government conduct does not involve an element of judgment or choice, and thus is not discretionary, if a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow, because the employee has no rightful option but to adhere to the directive.'" Ochran, 117 F.3d at 499 (quoting Gaubert, 499 U.S. at 322 (internal citations and quotations omitted)); see also Cohen, 151 F.3d at 1341.  As such, to determine whether the conduct at issue is discretionary, the Court must determine "whether the challenged act or omission violated a mandatory regulation or policy that allowed no judgment or choice."  Autery v. United States, 992 F.2d 1523, 1526 (11th Cir. 1993).

"Second, the court must decide 'whether that judgment is of the kind that the discretionary function exception was designed to shield,' i.e., whether it is 'susceptible to policy analysis.'" U.S. Aviation Underwriters, Inc., 562 F.3d at 1299 (quoting Gaubert, 499 U.S. at 322, 325)).  "The discretionary function exception is intended to prevent the courts from 'second-guessing' . . . administrative decisions grounded in social, economic, or political policy, through the medium of an action in tort.'" Id. (quoting Varig Airlines, 467 U.S. at 814).  "[I]f the conduct at issue involves the exercise of judgment, [the Court] must determine whether that judgment is grounded in considerations of public policy." Ochran, 117 F.3d at 499 (citing Gaubert, 499 U.S. at 322-23).  The focus is on "'the nature of the actions taken and on whether they are susceptible to policy analysis.'" Id. at 500 (quoting Gaubert, 499

U.S. at 325).  "If the decision is inherently one allowing discretion, we presume that the act was grounded in policy whenever that discretion is employed."  OSI, Inc. v. United States, 285 F.3d 947, 951 (11th Cir. 2002).  Additionally, the Court recognizes that in determining whether the judgment is of the type the discretionary function exception was intended to shield, a court does "'not focus on the subjective intent of the government employee or inquire whether the employee actually weighed social, economic, and political policy considerations before acting.'"  Cohen, 151 F.3d at 1341 (quoting Ochran, 117 F.3d at 500).

## III.   Discussion

Preliminarily, the Court must address what appears to be a dispute between the parties with regard to Wills's theory of liability.  The United States seeks dismissal of this action by framing Wills's theory of liability as two separate claims: 1) Wills's allegations concerning the Park Service's negligence related to the condition of the drop off where she fell; and 2) Wills's negligent supervision claim.  However, in the Complaint and Response, Wills indicates that her allegations relating to the seawall drop off and her allegations relating to the private tour group do not constitute separate claims.  Wills alleges that on the night of her injury, she

> observed a number of individuals, some dressed in costume and holding lanterns or other lights, walking on the grounds of the monument.  She walked over toward this group on the grounds and walked up steps to a concrete area.  At this time, the group of individuals began to walk away, taking the lanterns or lights with them.  There was no other lighting.  Plaintiff noticed that the concrete in this area was broken up and as she started to walk to the right to avoid the concrete, she fell.  Unknown to her there was a drop off of several feet in this area.

Complaint ¶ 5. Wills further alleges that "[t]he group of individuals that attracted Plaintiff to the grounds of the Castillo de San Marco was a Ghost Tour, or other tour, operated by a

private company in possession of a [CUA] issued by the Defendant through the Department of Interior."  Id. ¶ 6.  In light of these allegations, Wills asserts that the United States breached its duty to Wills by allowing a dangerous drop off to exist, by failing to warn of the drop off, by failing to provide adequate lighting in the drop off area, by failing to erect a guard rail or barrier, and by negligently failing to supervise private companies operating under a CUA.  Id. ¶ 8.  Additionally, Wills alleges that "Defendant knew, or reasonably should have known, that members of the public, including Plaintiff, who were on the grounds as a result of activities conducted by private companies with [CUAs] would be exposed to the dangers posed by these drop offs."  Id. ¶ 9.  Indeed, in the Response, Wills argues that

> [t]he allegations concerning the ghost tour operating under a CUA and the manner in which its activities contributed to this incident, is not a separate claim as alleged by the Defendant.  It is part and parcel of Plaintiff's negligence claim.  When it issued the CUA, the Castillo recognized that allowing these types of tours at night would expose the public to the danger of changes in elevation and lack of lighting on the grounds.

Response at 15.  Thus, upon review of the Complaint and Response, the Court is not convinced that Wills has alleged a claim of negligent supervision as a separate theory of liability.  Rather, Wills's theory of liability appears to be that she was attracted to the Castillo grounds because she saw a ghost tour or other private company operating under a CUA on the premises, and that once there, she was exposed to the dangerous condition of the seawall drop off.

Having identified Wills's theory of liability, the Court now turns to the United States's argument that Wills's action is barred by the discretionary function exception to the FTCA. Before determining whether the United States's conduct violated a mandatory regulation or policy and whether the challenged actions are susceptible to policy analysis, the Court must

first identify the conduct at issue.  <u>Autery</u>, 992 F.2d at 1527; <u>see</u> <u>also</u> <u>Spencer v. United States</u>, No. CV 114-132, 2014 WL 6705451, at *3 (S.D. Ga. Nov. 26, 2014) ("[T]he court 'first must identify the conduct that is alleged to have caused the harm, then determine whether the conduct can fairly be described as discretionary, and if so, decide whether the exercise or non-exercise of the granted discretion is actually or potentially influenced by policy considerations.'").  As previously noted, the United States's Motion is based on the assumption that the challenged conduct is divisible into two categories: 1) the Park Service's decision not to provide signs, lighting, and railings in the area of the seawall drop off; and 2) the Park Service's negligent supervision of private tour companies operating on the Castillo grounds under a CUA.  While the disorganized nature of Wills's Response makes it somewhat difficult to identify what conduct she asserts to be at issue, it appears that Wills contends that the challenged conduct is the combination of the allegedly unsafe condition of the seawall drop off and the Park Service's alleged negligence in allowing private companies to operate under a CUA on the premises.  However, the Court is not persuaded that the challenged conduct at issue in this case is in any way related to the private companies operating under a CUA on the Castillo grounds.  Although Wills alleges in the Complaint that she was "attracted" to the Castillo grounds by the unidentified private tour company, <u>see</u> Complaint ¶ 6, in her sworn statements she avers that she was not attracted to Castillo grounds because of the private tour company but rather went on the grounds because her daughter wanted to show Wills's son the Monument.  Wills Dep. at 49-50, 55-56.  Wills's sworn statements further reflect that although she saw the private tour company

in the distance, she was not at any point "following" the tour company. Id. at 55-56.[3]  Yet,

even accepting the allegations of Wills's Complaint to be true, they do not suggest that the

challenged conduct is at all related to the private tour company.  Wills does not allege that

she was participating in the private tour on the Castillo grounds.  Nor does she suggest that

the private tour company acted in a negligent manner or that the private tour company or its

actions had anything to do with the allegedly dangerous condition of the seawall drop off

which caused Wills's fall.[4]  As such, the Court determines that the challenged conduct is

properly characterized as the Park Service's alleged negligence in not providing signs,

lighting, railings, or barriers with respect to allegedly unsafe seawall drop off.

### A.      Whether the nature of the challenged conduct involves an element of judgment or choice

Having identified the challenged conduct at issue in this case, the Court must next

determine whether that conduct involves an element of judgment or choice.  Hughes v.

United States, 110 F.3d 765, 767 (11th Cir. 1997).  "The requirement of judgment or choice

is not satisfied if a 'federal statute, regulation, or policy specifically prescribes a course of

---

[3] With no citation to authority, Wills asserts that "the allegations of the Complaint must be taken as true for purposes of this motion."  Response at 15.  The United States asserts that "[w]hen facing a factual challenge to subject matter jurisdiction and a motion for summary judgment such as here, like it or not, Plaintiff is bound by her sworn deposition testimony."  Reply at 3.  In a challenge to subject matter jurisdiction under Rule 12(b)(1), the Court may consider matters outside of the pleadings and is free to weigh the evidence concerning jurisdiction as long as the issues do not implicate the merits of plaintiff's action.  See Morrison, 323 F.3d at 924-25.  Here, Wills's testimony regarding the circumstances surrounding her fall implicates the question of what is the challenged conduct at issue in the United States's motion to dismiss based on the discretionary function exception.  Thus, the Court may properly consider Wills's testimony in defining the challenged conduct for purposes of assessing whether the Court has jurisdiction over this action.

[4] "In analyzing an FTCA claim, this court applies the law of the state where the alleged tort occurred." Lambert v. United States, 198 F. App'x 835, 838 (11th Cir. 2006) (citing Stone v. United States, 373 F.3d 1129, 1130 (11th Cir. 2004)).

action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive.'" Gaubert, 499 U.S. at 322 (quoting Berkovitz, 486 U.S. at 536).  Thus, the relevant inquiry is "whether controlling statutes, regulations, and administrative policies mandated" that the Castillo not allow access to the allegedly dangerous drop off at the seawall or that the Castillo provide a warning sign, lighting, barrier, or guard rail at this location.  See Autery, 992 F.2d at 1528.

In the Motion, the United States argues that the Park Service has discretion, under pertinent statutes and policies, to determine whether or not to install warning signs, lighting, and railings at a particular location.  Motion at 12.  The authority of the Park Service is derived from the 1916 Park Service Organic Act, which created the Park Service and placed it under the charge of a director appointed by the Secretary of the Interior.  16 U.S.C. § 1; see also Autery, 992 F.2d at 1528.  Under the Act, the Park Service

> shall promote and regulate the use of the Federal areas known as national parks, monuments, and reservations . . . by such means and measures as conform to the fundamental purpose of the said parks, monuments, and reservations, which purpose is to conserve the scenery and natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

16 U.S.C. § 1.  The Park Service has also adopted regulations and guidelines in furtherance of the mission set forth in the Act.  These regulations and guidelines are set forth in the Management Policies 2006 manual ("Management Policies"), the version in effect at the time of Wills's injury. See Defendant's Exhibit A-7 (Doc. 32-3 at 10-24; Def.'s Exhibit A-7).  The Management Policies provide for general policies relating to visitor safety but do not contain

specific or mandatory directions on how to warn visitors of various dangers or how to

address safety concerns.  Specifically, the Management Policies provide:

> The saving of human life will take precedence over all other management actions as the Park Service strives to protect human life and provide for injury-free visits. The Service will do this within the constraints of the 1916 Organic Act. The primary—and very substantial—constraint imposed by the Organic Act is that discretionary management activities may be undertaken only to the extent that they will not impair park resources and values.
> . . .
> Park visitors must assume a substantial degree of risk and responsibility for their own safety when visiting areas that are managed and maintained as natural, cultural, or recreational environments.
>
> These management policies do not impose park-specific visitor safety prescriptions. The means by which public safety concerns are to be addressed is left to the discretion of superintendents and other decision-makers at the park level who must work within the limits of funding and staffing. Examples include decisions about whether to install warning signs or artificial lighting . . . or install guardrails and fences[.] . . . Some forms of visitor safeguards typically found in other public venues—such as fences, railings, and paved walking surfaces—may not be appropriate or practicable in a national park setting.

Id., § 8.2.5.1.  Additional regulations give Park Service management considerable discretion

regarding the use and placement of signs and the installation of artificial lighting.

Specifically, the Management Policies provide that "[s]igns will be held to the minimum

number, size, and wording required to serve their intended functions and to minimally intrude

upon the natural and historic settings.  They will be placed where they do not interfere with

park visitors' enjoyment and appreciation of park resources."  Id., § 9.3.1.1.  The Director's

Order regarding park signs, see Defendant's Exhibit A-8 (Doc. 32-3 at 25-31; Def.'s Exhibit

A-8), provides that the "[Park Service] sign program management should result in signs that

. . . [o]ffer clear, concise, and consistent communications to park visitors while not intruding

on natural and historic settings." Def.'s Exhibit A-8 at 3. With regard to the installation of

artificial lighting, the Management Policies provide:

> The Service will preserve, to the greatest extent possible, the natural lightscapes of parks, which are natural resources and values that exist in the absence of human-caused light.
> . . .
> Improper outdoor lighting can impede the view and visitor enjoyment of a natural dark night sky. Recognizing the roles that light and dark periods and darkness play in natural resource processes and the evolution of species, the Service will protect natural darkness and other components of the natural lightscape in parks.
> . . .
> The decision about whether or not to install artificial lighting in particular circumstances is left to the discretion of the superintendent and is made through the planning process.

Exhibit A-7, § 4.10. Thus, the plain language of these guidelines indicates that the Park

Service has significant discretion in determining how to address safety concerns and

explicitly has discretion with respect to warning signs, lighting, guardrails and fences.

Because there is no specifically prescribed course of action regarding issuing warnings or

installing signs, lights, or railings, the first prong of the discretionary function exception is met

with respect to the challenged conduct at issue in this case. See Autery, 992 F.2d at 1529

("Such a general guideline is insufficient to deprive the federal government of the

discretionary function exception.").

In the Response, Wills cites Gabriel v. United States, No. 3:06-cv-917-J-32HTS, 2009

WL 22289 (M.D. Fla. Jan. 2, 2009), a remarkably similar case in which the Court found the

discretionary function exception applicable to an FTCA claim by a plaintiff who fell and was

injured at the Castillo in 2005, and points to Wilson's deposition taken in that case, in which

Wilson describes the park's safety committee which would undertake "hazard hunts" to "look

for things that could represent unsafe conditions." See Response at 8; Plaintiff's Exhibit C

at 10 (Doc. 36-3; Pl.'s Exhibit C).   Referencing these hazard hunts, Wills asserts that

"[h]aving adopted a safety policy which required its employees to identify and perform

maintenance on and report unsafe conditions that could affect visitor safety, the Defendant

had a duty to perform this responsibility in a non-negligent manner."  Response at 9.  As

such, Wills contends that this safety policy "constituted a mandated and not a discretionary

safety policy" such that the discretionary function exception to the FTCA does not apply.  Id.

at 9-10.  Wills acknowledges that the same argument was made without success in Gabriel

but asserts that the case, Sakal v. United States, No. 09-21933-CV, 2010 WL 3782135 (S.D.

Fla. June 14, 2010), warrants a different result.  Id. at 10.

In Sakal, the plaintiff brought a negligence action against the United States pursuant

to the FTCA alleging that he sustained injuries at the Everglades National Park when he

slipped and fell on a boat ramp.  Sakal, 2010 WL 3782135, at *1.  Finding the discretionary

function exception inapplicable to the plaintiff's claim, the district court determined that

although it was "undisputed that there were no precise and/or explicitly mandated

procedures for maintaining the [r]amp", "[P]ark employees were mandated to generally

inspect and maintain the premises, as prescribed in the Park's Risk Management Program,

Strategic Planning, unwritten and written policies, [a]nd past performance."  Id. at *3.  The

Park's written policies included general directives such as, "All [Park] employees are

responsible for reviewing the public environment for situations or conditions potentially

hazardous to visitors."  Id. at *4.  Additionally, the Park had an "unwritten policy" and "prior

performance of employees" which required daily visual inspection of and a walk across the

boat ramp "to determine whether it felt slippery and needed cleaning." Id. The inspection plan did not impose a schedule for cleaning the ramp, but "[e]mployees were free to pressure wash the [r]amp if [they] felt there was a need to do so." Id. (third alteration in original). The district court determined that the written and unwritten policies, including the requirement that employees inspect the ramp daily and wash "as needed", were "sufficient to meet the 'fixed' and 'readily ascertainable' standard" of a policy which is mandated and not discretionary for purpose of the first prong of the discretionary function exception. Id.

Wills argues that "Sakal serves as persuasive argument" that "an unwritten policy requiring governmental employees to periodically identify and report safety hazards is not a discretionary function[.]" Response at 11. However, neither the facts and circumstances of the instant case nor the Sakal case warrant a different result from the Court's decision in Gabriel. In Gabriel, the plaintiff was visiting the Castillo and decided to sit on benches located on the glacis area of the Monument grounds. Gabriel, 2009 WL 22289, at *1. When the plaintiff stood up from the bench, she took several steps forward across a grassy area in front of the bench and "unexpectedly" stepped off a several foot drop off, "striking her face on the sidewalk below." Id. Like Wills, the Gabriel plaintiff argued that because Castillo management decided to conduct the hazard hunts, a duty arose to perform the hunts in a non-negligent manner. Id. at *4. In rejecting this argument, the Court explained that the hazard hunts were not the challenged action in that case. Id. at *5. Specifically, the Court determined that "Plaintiffs are not alleging that the Park Service negligently failed to inspect for hazards; rather that the Park Service failed to protect the public from a particular hazard." Id. Additionally, the Court noted that the hazard hunts "did not require that specific

conditions, if found, be corrected." Id. Wills's claim is similarly based on a permanent and fixed part of the Castillo grounds - the seawall and water battery.  As such, the Court's analysis in Gabriel with respect to the argument regarding the hazard hunts is equally applicable here.  Moreover, Sakal is distinguishable and thus does not warrant a different result.  The unwritten policy at issue in Sakal required an inspection and cleaning of the ramp and was therefore directed at the challenged conduct at issue in that case - failing to inspect and maintain a slippery boat ramp.  In contrast, the hazard hunts at the Castillo are directed at things like burnt out light bulbs or similar conditions that could impact visitor safety - not fixed and permanent structural aspects of the Monument.  See Gabriel, 2009 WL 22289, at *6 ("Furthermore, the example used by Wilson to describe the purpose of the hazard hunts, a burnt out light bulb, is much different than the permanent and fixed part of the Castillo grounds that is at issue in this case.").  Because the Court concludes that the conduct at issue in this case involves elements of judgment or choice on the part of employees of the United States, the Court determines that the first prong of the Gaubert analysis has been satisfied.  Accordingly, the Court now turns to the second prong of the Gaubert analysis, i.e., whether the judgment at issue is grounded in considerations of public policy.

**B.    Whether the United States's decision was grounded in considerations of public policy**

Under the second prong of the Gaubert test, the Court must "focus on whether the challenged actions are susceptible to policy analysis."  Hughes, 110 F.3d at 768.  As discussed supra, the challenged conduct in this case is the Park Service's alleged negligence in not providing signs, lighting, railings, or barriers with respect to the allegedly unsafe seawall drop off.  Because the applicable policies and guidelines allow the Park

Service to exercise discretion with respect to safety considerations, in accordance with Gaubert, the Court must presume that a weighing of policy considerations took place. See Gaubert, 499 U.S. at 324.  However, "[f]or a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." Id.

The United States argues that decisions concerning whether or not to post warning signs and install artificial lighting or guardrails where Wills fell are decisions grounded in balancing the competing interests of safety and preserving the historical integrity and historic structures of the Castillo.  Motion at 17-18.  Indeed, Wilson testified that "[t]he Park Service's mission is to preserve resources and provide enjoyment of resources in such a manner that leaves them unimpaired for the enjoyment of future generations."  Wilson Decl. ¶ 12.  Wilson further testified that there are "competing priorities" involved in managing the Castillo, including:

> the need to maintain the historical integrity of the grounds; to preserve historic structures and features; to minimize the number of non-authentic features; to minimize archeological disturbance; to provide the experience of a seventeenth, eighteenth, and nineteenth century interpretive theme . . .; to manage limited financial resources; and to provide for visitor safety.

Id. ¶ 13.  These competing priorities carry over into the decisions management makes regarding installing lighting, signs, guardrails and other similar items.  Id. ¶ 14.  With respect to lighting, Wilson testified that "[e]xcessive lighting on the grounds would compromise the historic context of the visitor experience, and detract from the Castillo itself[.]" Id. ¶ 15.  Wilson also testified that "[a]dding permanent lighting typically requires adding underground power, which in turn causes ground disturbance" which could affect archeological resources.

Id. ¶ 16.  Wilson further testified that "[w]ith respect to adding modern features" like signs and guardrails, management "seek[s] to refrain, when possible from introducing non-historic elements to the Monument."  Id. ¶ 17.  The Eleventh Circuit has recognized that "[g]enerally, courts have held that decisions about what safety measures to employ in national parks and how to execute them involve balancing the same considerations that inform all policy decisions regarding the management of national parks: safety, aesthetics, environmental impact, and available financial resources."  Autery, 992 F.2d at 1530.  Accordingly, "when the Park Service balances safety considerations against the interest in preserving the natural environment, that decision is grounded in policy."  Id.  Thus, in light of Wilson's testimony and the Castillo's historic importance, the United States has amply shown that the Park Service's challenged conduct with respect to the seawall drop off is susceptible to a weighing of policy considerations.  Wills may not agree with the Park Service's decision.  However, "once the court finds government activity is discretionary, it is irrelevant whether the Government was in fact negligent in exercising that discretion."  Davis v. United States, 918 F. Supp. 368, 372 (N.D. Fla. 1996).

In the Response, Wills again cites Sakal but for the proposition that the discretionary function exception does not apply to "garden variety decisions" such as "implement[ing] . . . an existing safety policy."  Response at 11.  In Sakal, the court stated that to fall within the discretionary function exception, the government's actions must involve considerations which are "directly related to effectuating agency goals" and that "purely administrative, 'garden variety' decisions are consistently classified as not being related to underlying social, political, or economic policies."  Sakal, 2010 WL 3782135, at *5.  In light of this standard, the

court determined that the Park employees' decision regarding whether or not to clean the boat ramp was of the "garden variety" and "lacked actual political, economic, or social considerations" such that the government failed to meet the second prong of the discretionary function exception. Id. at *6-7.[5]

However, Sakal is distinguishable from the instant case with respect to the second prong of the discretionary function exception, as well. The challenged conduct at issue in Sakal involved maintenance and inspection of a boat ramp in Everglades National Park. In contrast, the conduct at issue in the instant case involves the Park Service's decision not to introduce modern features including signs, lighting, and guardrails, into a historic structure on historic grounds. In Gabriel, the Court distinguished Gotha v. United States, 115 F.3d 176 (3d Cir. 1997),[6] a case upon which Wills also relies, because the conduct at issue "involved discretionary decisions almost wholly unrelated to the mission of the federal agency involved[.]" Gabriel, 2009 WL 22289, at *6. Sakal is unpersuasive for the same reasons. Insuring that a boat ramp is not slippery is unrelated to the Park Service's mission in administering Everglades National Park. In contrast and as stated by the Court in Gabriel, "[h]ere, the challenged decision of the Park Service goes straight to the Services' core mission of managing national monuments." Id.

---

[5] The Sakal court further relied on the facts that the cleaning of the ramp would require only a brief, temporary closing and that preserving the natural habitat was not at issue in that case because the ramp was a concrete, man-made structure. Sakal, 2010 WL 3782135, at *7.

[6] In Gotha, the court determined that the Navy's decision to not place a handrail on a steep footpath leading to a structure under its control was a "mundane, administrative, garden-variety, housekeeping problem that is about as far removed from the policies applicable to the Navy's mission as it is possible to get." Gotha, 115 F.3d at 178, 181.

Additionally, Wills cites several cases for the proposition that a failure to warn of a known hazard takes a decision outside the scope of the discretionary function exception and argues that in light of the injury at issue in <u>Gabriel</u>, the United Sates "knew or should have known of the dangers created by unguarded and unlighted drop-offs due to the occurrence of similar prior incidents and claims, and that the Defendant's employees were negligent in failing to take steps to correct or warn of this danger." Response at 6-7, 8. However, the decisions cited by Wills for the proposition that a failure to warn of a known hazard is outside the discretionary function exception are all non-binding authority, and many rest on the failure of proof by the government. <u>See, e.g.</u>, <u>Duke v. Dep't of Agric.</u>, 131 F.3d 1407, 1412 (10th Cir. 1997) (discretionary function exception did not apply where the court's "review of the record reveals no evidence by the government of any social or political justification" but instead "simply relies on the presumption that there was some policy reason for the failure to do anything at the site" of the plaintiff's injury); <u>Summers v. United States</u>, 905 F.2d 1212, 1215 (9th Cir. 1990) ("There is no evidence, however, that the [Park Service's] failure to post warnings of the sort that would have prevented [the plaintiff's] injury was the result of a decision reflecting the competing considerations of the Service's sign policy."). Moreover, the Supreme Court in <u>Gaubert</u> instructed that "[t]he focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." <u>Gaubert</u>, 499 U.S. at 325. As stated by the Court in <u>Gabriel</u>, because "the challenged action is of the type susceptible to policy analysis" it does not matter that Wilson or the Park Service was

on notice of a similar accident.  Gabriel, 2009 WL 22289, at *6.  "[T]he discretionary function exception protects the Park Service['s] decision not to react to the earlier incident."  Id.

Wills also argues that she was actually injured on a "wooden staircase structure that abutted the sea wall" and that this modern feature does not implicate the aesthetic or historical policy considerations cited by the United Sates.  Response at 11-12.  According to Wills, "[w]e are dealing not with a historical feature that must be preserved but a modern pressure treated staircase used to access such a feature that simply failed to extend a guardrail a few more feet."  Id. at 12.  In the Reply, the United States disputes Wills's assertion that she fell off a set of wooden stairs based on her deposition testimony and other record evidence which shows that Wills fell when she stepped off the seawall mistakenly believing the ground was level with it.  Reply at 2-3; Wills Dep. at 62-63.  However, even assuming Wills did fall off the wooden staircase and not the concrete seawall, the Park Service's policy considerations regarding the installation of barriers, rails, and lighting are equally applicable.  The Park Service's decision to include a small, modern feature like a wooden staircase within the larger historic setting of the Monument grounds simply reflects the competing considerations of providing the public with access to and enjoyment of resources while striving to leave the historic site largely unimpaired for future generations. Therefore, the Court concludes that the second prong of the Gaubert test has been satisfied and that the discretionary function exception to the FTCA applies to this case.

## IV.    Conclusion

Under the FTCA, the United States may be held liable for money damages for "injury or loss of property, or personal injury or death caused by the negligent or wrongful act or

omission of any employee of the Government while acting within the scope of his office or employment" in the same manner and to the same extent as a private person under like circumstances.  28 U.S.C. § 1346(b)(1); Turner, 514 F.3d at 1203.  However, the waiver of sovereign immunity contained in the FTCA is a qualified waiver.  See Autery, 992 F.2d at 1526.  The discretionary function exception to the FTCA, which is at issue in this case, "precludes government liability for '[a]ny claim based upon . . . the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.'"  Cohen, 151 F.3d at 1340 (quoting 28 U.S.C. § 2680(a)).  If the discretionary function exception to the FTCA is applicable to a plaintiff's claim, that claim must be dismissed for lack of subject matter jurisdiction.  See Cohen, 151 F.3d at 1340.

In this case, Wills asserts a negligence claim against the United States pursuant to the FTCA.  Upon review, and for the reasons set forth above, the Court determines that the discretionary function exception to the FTCA applies to Wills's claim against the United States.  Because the discretionary function exception to the FTCA applies, Wills's claim is due to be dismissed for lack of subject matter jurisdiction.

In light of the foregoing, it is hereby **ORDERED**:

1.      Defendant's Dispositive Motion to Dismiss and Motion for Summary Judgment (Doc. 32) is **GRANTED** to the extent that this case is **DISMISSED** pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction.  Otherwise, the Motion is **DENIED**.

2.      The Clerk of Court is directed to terminate all pending motions and deadlines as moot and close the file.

**DONE AND ORDERED** in Jacksonville, Florida, on May 28, 2015.

**MARCIA MORALES HOWARD**
United States District Judge

lc18

Copies to:

Counsel of Record